

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-2007

# Hare v. Postmaster General

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5238

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Hare v. Postmaster General" (2007). *2007 Decisions.* Paper 1448.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1448

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-5238

———

JAMIE G. HARE,

*Appellant*

v.

JOHN E. POTTER, POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 02-cv-07373)
District Court Judge: Honorable Bruce W. Kauffman

———

Argued March 13, 2007

Before: FUENTES, VAN ANTWERPEN, and SILER*, *Circuit Judges*.

(Filed March 21, 2007)

Kathryn Boockvar (Argued)
Jordan B. Yeager
Boockvar & Yeager
8 West Oakland Avenue
Doylestown, PA 18901

    *Counsel for Appellant*

———

\* The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth
Circuit, sitting by designation.

Viveca D. Parker (Argued)
K.T. Newton
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

    *Counsel for Appellee*

————

OPINION OF THE COURT

————

VAN ANTWERPEN, *Circuit Judge*.

    Appellant Jamie G. Hare brought a variety of Title VII retaliation and gender discrimination claims against her employer, the United States Post Office. The District Court granted the Postmaster General's motion for summary judgment as to all of her claims. We will reverse and remand as to two of Hare's claims under 42 U.S.C. § 2000e-3(a) and as to one of her claims under 42 U.S.C. § 2000e-2(a): that the Post Office retaliated against her by not selecting her for an internal managerial skills improvement class; that the Post Office retaliated against her by creating a hostile work environment; and that the Post Office retaliated against her based on her sex.

I.

    Because we write solely for the benefit of the parties, we will set forth only those facts necessary to our analysis. Furthermore, because this case was decided against Hare in the District Court on the Postmaster General's motion for summary judgment, we

1

recite the facts in the light most favorable to Hare.[1]

*Encounter with Lawrence McCullough*

Hare's claims arise from a series of events that began when Postal Inspector Lawrence McCullough contacted her on February 10, 2000, about her encounter with an irate customer earlier in the month. McCullough contacted Hare by phone and asked her questions that seemed to her intrusive, embarrassing, and irrelevant, such as the following: Are you white? How tall are you? How much do you weigh? What color hair do you have? What is your husband's name? How old is your husband? Do you have any scars or tattoos? What kind of car do you drive? Did you go to college? App. at 406. The next day, on February 11, 2000, McCullough met with Hare, and asked her to reenact her run-in with the irate customer, pretending that he was the customer. At one point during this reenactment, Hare claimed McCullough pressed his body up against hers and said, "This is good. This is really, really good." App. at A38. Also during this meeting, McCullough told Hare that she was a "very beautiful woman" and essentially accused Hare of being a prostitute with a substance abuse problem. App. at A408. McCullough also said, "I can audit you and make your life hell." App. at A38. Overall, McCullough's behavior during this meeting made Hare uncomfortable and scared.

After the meeting with McCullough adjourned, McCullough left Hare's office. Hare later spotted McCullough in the parking lot of her Post Office as she was leaving for

---

[1]The Postmaster General disputes Hare's characterization of the facts and claims that she engages in exaggeration and embellishment.

lunch. McCullough positioned his car so that Hare could not pull out of her parking space and then asked Hare to join him for lunch. Hare refused. McCullough then said that he wanted to take her to lunch "to make her feel better." App. at A38. He also repeatedly said, "I just want to comfort you." App. at A.38. Out of fear, Hare eventually agreed to accompany McCullough to McDonald's for lunch.

After lunch, McCullough dropped Hare off at the Post Office, and Hare believed that he had left the premises for the day. However, he came back into her office later in the afternoon and told Hare that he was sorry for how he treated her. He also said that he "wanted to be there" for Hare. App. at A41.

After these incidents, Hare contacted a friend and asked the friend to follow her home from work out of fear of McCullough. She also contacted her children and told them not to answer the door if McCullough came to their home.

It appears from the record that Hare and McCullough never had any further interactions after February 11, 2000.

*Hare Complains about McCullough*

After McCullough left for the day, Hare contacted her manager Dan Reiss and told him about the incident. He instructed her to record what had happened to her in writing. Hare did so, and submitted a statement to Reiss on February 13, 2000.

Over the next few days, Reiss communicated with McCullough's manager, William Burmeister. Burmeister made some negative comments about Hare to Reiss, and he ultimately indicated that he would not discipline McCullough for the incident and that

3

Reiss should contact Edward Burke, Reiss' manager. Reiss did so, and he, Burke, and Hare met in late February and then again on March 24, 2000. At their second meeting, Burke explained that he thought McCullough was "a very straightforward family guy," and, since there were no other incidents in his past, he believed the incident was a "misunderstanding." App. at 308. He then told Hare he did not believe there was "anything to be gained by going further" with her claim. *Id.* Ultimately, no action was taken against McCullough by Burke or Burmeister.

*Hare Not Selected for POOM or CMP*

In the midst of reporting the McCullough incident to her superiors, Hare was nominated by Reiss on March 21, 2000, to participate in a special program for promising employees called the Career Management Program ("CMP"). Reiss thought highly of Hare, as evidenced by his rating her as "Far Exceeds" (the highest performance rating) in 1999 and 2000 and his nomination email discussing her accomplishments in 1998 and 1999. Hare also believed Burke thought highly of her, as evidenced by his twice awarding her with performance awards in 1999. These accolades, Hare believed, positioned her well for a slot in the CMP. However, on March 28, 2000, just four days after Burke told Hare to drop her claims, Burke chose not to send Hare to the CMP. He claimed his decision was based on Hare not having a sufficiently high job grade.

On March 29, 2000, the day after being rejected for the CMP, Hare applied for a job as a Post Office Operations Manager ("POOM"), a position for which Reiss believed her qualified. On May 25, 2000, Burke held interviews for the position but did not extend

4

an interview to Hare. Hare claims the five candidates Burke interviewed were less qualified than she in that they had little or no experience as Acting POOM's or Postmasters. Hare had been Postmaster of Nesquehoning since 1999 and had repeatedly served as an Acting POOM. Burke claims that a review board selected the five people that he interviewed, and that he played no role in deciding not to interview Hare. On June 29, 2000, Burke selected another candidate for the POOM position.

As a result of the incident with McCullough and being denied participation in CMP and the POOM job, Hare contacted a counselor at the Equal Employment Opportunity Commission ("EEOC") and reported her problems on July 18, 2000.

*Postmaster Job in Nazareth*

Hare continued to work as Postmaster of Nesquehoning until April 2001, when she was promoted to Postmaster of Nazareth, a position for which she had applied.[2] Apparently, Burke made this promotion possible. Hare's manager in Nazareth was Jeffrey Ruth. Hare and Ruth maintained a good working relationship during their first few months together. Then, on August 9, 2001, Hare requested time off from Ruth to attend a deposition on August 21, 2000, in connection with her EEOC claim. Ruth was agitated by this request and he began talking to Hare about her claim. He told her that she should not pursue it and that she was wrong to implicate Burke, especially after he promoted her to

---

[2]Even though Hare continued to hold the title of Postmaster in Nazareth, her job "level" was increased from 18 to 20 when she moved. She claims, however, that she had been receiving level 20 pay in Nesquehoning because of an additional assignment she had undertaken there.

5

Nazareth. Hare defended her decision to pursue the claim, indicating that it was a matter of principle, and eventually started to cry. In response to her crying, Ruth said, "There's no room for that in this corporation." App. at A366. Hare eventually asked Ruth whether her claim would affect his perception of her, to which Ruth responded, "I don't know." App. at 367.

As a result of this conversation, Hare became distressed and suicidal. She immediately left work for the day, and she contacted a counselor at an employee assistance program. On September 13, 2001, Hare amended her complaint with the EEOC to include retaliation and hostile work environment claims against Ruth based on their August 9, 2001, conversation.

After their heated exchange, Ruth began to treat Hare poorly. Over the next few months, he failed to respond to Hare's emails, refused to provide her with sufficient resources to run the Nazareth Post Office, gave her contradictory instructions, yelled at her, and monitored her work excessively. In addition, the Nazareth Post Office became the target of multiple audits. Because of these audits, the poor treatment by Ruth, and operating problems at the Post Office, Hare had to work six days a week for up to 12 to 14 hours a day, well in excess of what other Postmasters worked. Hare believes that Ruth treated her even more poorly after she amended her EEOC complaint to include him.

Hare eventually "broke down" emotionally, and, on October 23, 2001, she went to her doctor, complaining of stress. Hare's doctor referred her to a psychiatrist, whom she met on October 30, 2001. Hare was out sick from work from the end of October until

6

November 6, 2001. While she was out sick, Post Office employees contacted Hare on a daily basis to ask her questions, and, at the direction of Ruth, no employee was assigned to cover Hare's work. When Hare returned, her Post Office was in disarray and Ruth continued to treat her poorly. He required that witnesses be present whenever he spoke with Hare.

In December 2001, Hare "broke down" once again and went out on leave as provided under the Family Medical Leave Act ("FMLA"). While she was on leave, Ruth ordered that the Nazareth Post Office locks be changed and sealed her stamp stock. This latter action, Hare believes, damaged her reputation because it made it look like she had done something improper with the stamps.

On January 11, 2002, while out on leave, Hare contacted Ruth and Burke, told them that she was pregnant, and asked that she be able to report to someone other than Ruth when she returned. Burke granted her request, assigning her to Charlie Osmond, and Hare returned to work in mid-January 2002.

*Hare's Return to Work in 2002*

When Hare first returned to the office in January 2002, she assisted in an audit of her sealed stamp stock. In providing this assistance, she performed some heavy lifting. A few weeks after this heavy lifting, she suffered a miscarriage. She believes the heavy lifting caused her miscarriage.

Hare claims Ruth continued to mistreat her after she returned from FMLA leave,

7

even though he was no longer her manager. As evidence of this she points to the following: Ruth gave her a "Met Objectives" rating instead of a "Far Exceeds" for 2001, even though Reiss recommended that she receive a "Far Exceeds" for the work she had done under him during the first half of that year;[3] Ruth called the Office of the Inspector General to investigate some irregularities with the Nazareth Post Office's fuel credit card instead of simply asking Hare about them; Ruth warned Hare's subsequent managers about her EEOC claims; Ruth, in a presentation in front of 40 to 50 Postmasters that Hare did not attend, "made it seem like [Hare] was the worst Postmaster in history"; and, at the end of 2003 or the beginning of 2004, Ruth indicated to a postal customer that Hare was a difficult employee. App. at 80.

Hare also claims other employees mistreated her in the years following her EEOC claim. She says subsequent managers made comments to her about her claim and, like Ruth, made it difficult for her to get her work done. In addition, throughout 2004, several things occurred that made her believe the Post Office wanted her to leave: her Post Office's utility bills were not paid as they should have been; her computer login was mysteriously deleted; there was an error in her paycheck; and her Post Office was the subject of a security audit that she believed was not necessary.

On December 16, 2004, Hare's manager told her that he could not find someone to cover for an absent employee on December 24 (i.e., Christmas Eve) and, as a result, she

---

[3]"Met Objectives" is the second highest performance rating and is one rating below "Far Exceeds."

would have to work. Hare was supposed to have that day off. Hare became very upset and decided she could no longer tolerate working for the Post Office. On December 18, 2004, Hare submitted her letter of resignation, indicating that December 24, 2004 would be her last day.

II.

The District Court had subject matter jurisdiction over Hare's Title VII claims pursuant to 28 U.S.C. § 1331. We have jurisdiction to review the District Court's grant of summary judgment pursuant to 28 U.S.C. § 1291.

Our review of the District Court's grant of summary judgment is plenary. *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 246 (3d Cir. 2002) (citation omitted). Accordingly, "we apply the same test as the District Court should have applied initially." *Id.* That is, we will affirm the District Court's grant of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law*." Fed. R. Civ. P. 56(c) (emphasis added). In our review, we consider the facts and any inferences that follow from them in the light most favorable to the non-moving party, and we determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson*, 297 F.3d at 247 (internal quotation omitted).

"Summary judgment against a party who bears the burden of proof at trial . . . is

9

proper . . . [only if that party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Anderson*, 297 F.3d at 247 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). In this situation, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (internal quotations omitted).

III.

Hare essentially makes three claims under Title VII. First, she argues the Post Office violated 42 U.S.C. § 2000e-3(a) by retaliating against her for filing a claim with the EEOC. She claims this retaliation is evidenced by her not being selected for the POOM job or the CMP, receiving a lower performance rating, and being harassed by Burmeister, Burke, Ruth, and her subsequent managers. Second, she argues the Post Office discriminated against her based on her sex in violation of 42 U.S.C. § 2000e-2(a)(1). Specifically, she claims she was sexually harassed by McCullough, her complaint against McCullough was inadequately investigated because she is a woman, and she was subjected to a hostile work environment created by her supervisors. Finally, she claims the Post Office violated Title VII by constructively discharging her.

With respect to Hare's retaliation and gender discrimination claims, we note at the outset that they are controlled by the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S.Ct. 1817 (1973). *See Moore v. City*

10

*of Philadelphia,* 461 F.3d 331, 342 (3d Cir. 2006) (applying the framework to a retaliation claim); *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.7 (3d Cir. 2006) (applying the framework to a gender discrimination claim). First, Hare must establish a *prima facie* case of retaliation or sex discrimination. Second, if she succeeds, the burden shifts to the Post Office to advance a legitimate, nonretaliatory or nondiscriminatory reason for its actions. Finally, if the Post Office advances such a reason, the burden shifts back to Hare to prove that the nonretaliatory or nondiscriminatory explanation is merely a pretext for discrimination. *See Atkinson*, 460 F.3d at 454. We also note that, in order for Hare to defeat the Post Office's motion for summary judgment, she "must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing and quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). That is, she must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id*. (citations and quotations omitted; alteration in original).

*A. Retaliation Claim Under § 2000e-3(a)*

To establish a prima facie case of retaliation under Title VII, a plaintiff must show

the following: (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse";[4] and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. —, 126 S.Ct. 2405, 2415 (2006); *Moore*, 461 F.3d at 340-41; *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001).

"Materially adverse" in this context means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, — U.S. at —, 126 S.Ct. at 2415 (citation and internal quotation omitted); *Moore*, 461 F.3d at 341. Stated differently, a plaintiff may meet her burden by demonstrating that her employer's conduct is "likely to deter victims of discrimination from complaining to the EEOC." *Burlington*, — U.S. at —, 126 S.Ct. at 2415 (internal quotation and citation omitted). "[P]etty slights, minor annoyances, and simple lack of good manners" are normally not sufficient to deter a reasonable person. *Id*.

---

[4]This definition of adverse employment action is the result of the Supreme Court's decision in June 2006 in *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. —, 126 S.Ct. 2405 (2006). Prior to *Burlington Northern*, this Court defined an adverse employment action as one that "alter[ed] the employee's compensation, terms, conditions, or privileges of employment, deprive[d] him or her of employment opportunities, or adversely affect[ed] his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (internal quotation and citation omitted). The District Court in Hare's case applied the old standard. The new standard "protects an employee from a wider range of conduct" than the old one. *Phelan v. Cook County*, 463 F.3d 773, 781 n.3 (7th Cir. 2006).

Whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. However, the Supreme Court has stated that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id*. Similarly, ordering an employee to do work assignments that are "more arduous and dirtier" may constitute "materially adverse" action. *Id*. at 2417.

With respect to the causation prong, we consider whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining "[t]he ultimate question in any retaliation case is an intent to retaliate *vel non*"). In assessing this, we may consider the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id*. at 450 (quotations and citations omitted). Above all, however, "each case must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000).

Hare claims the Post Office retaliated against her for filing claims with the EEOC by doing the following: (1) failing to select her for the CMP; (2) failing to promote her to the POOM position; (3) rating her as "Met Objectives" instead of "Far Exceeds" in 2001;

13

and (4) creating a hostile work environment.[5] We consider each of these below. She also claims the Post Office retaliated against her by constructively discharging her. Because we find Hare was not constructively discharged, see *infra* Section III.C., we find this claim lacks merit.

*1. Failing to Select for CMP*

Hare first claims the Post Office retaliated against her by not selecting her for the Career Management Program. She argues this is a materially adverse action because the program "is designed to train and fast-track employees with leadership skills into management-level positions." Hare's Br. at 10. She also argues that the timing of her being rejected by Burke for the program—just four days after he had met with Hare about the incident with McCullough—casts suspicion on Burke's motives. The Post Office argues Hare was not negatively affected by being excluded from the program, as the CMP is not a requirement for advancement. It further argues it had a nondiscriminatory reason for not selecting her: Burke limited his selection to individuals who were in a higher job "level" than Hare.

Applying the pre-*Burlington Northern* standard, the District Court found Hare's exclusion from the CMP did not rise to the level of an adverse employment action. In light of *Burlington Northern*, however, we find Hare's failure to be selected a "materially

---

[5]Hare also claims that the Post Office retaliated against her by not placing her "in Acting POOM positions or advanced OIC assignments." Hare's Br. at 51-52. Because Hare does not further elaborate or discuss these claims, we do not consider them.

adverse" action. An email to Hare's manager from a CMP coordinator describes the program as follows: "The Managerial Skills program provides participants strategies for managing USPS operations and the workforce. During the course the participants engage in a variety of learning activities and develop a draft IDP." App. at A486. In addition, Burke himself explained that the program helps participants "enhance their skills," and when asked whether the program is a stepping stone to advancement, he said, "It's important." App. at A299, A968. Given how the program may "contribute[] significantly to [an] employee's professional advancement," we find not being selected for it is a "materially adverse" action. *Burlington*, — U.S. at —, 126 S.Ct. at 2415.

Viewing all of the facts in Hare's favor, we also find Hare has shown a causal connection between her not being selected for the CMP and her discussing her sexual harassment complaint with Burke. First, these two events occurred just four days apart, establishing "temporal proximity." Second, Hare presents evidence that Burke had a reason to retaliate against her—Burke knew when he made the CMP decision that she would continue to pursue her claim in direct contravention of Burke's advice that she drop it. During her meeting with Burke, Hare claims Burke told her to "keep [her] mouth shut," and Burke admits that he told Hare that she had "nothing to gain" by pursuing her claim any further. App. at A42, A308. At the end of their meeting, however, Burke admitted that he knew Hare was not satisfied with his response and would not likely follow his advice. He explained, "I had hoped that that would be the end of it, but from talking to her and the way she conveyed to me, I could tell that she was not happy or

15

satisfied with that." App. at A307. Third, Hare presents evidence that Burke expressly threatened to retaliate against her if she pursued her claim. She claims Burke told her he would order a "random audit" of her Post Office by the Inspection Service if she did not drop her claim. App. at A42. Finally, as we explain below, Hare presents evidence that Burke may not have strictly relied on objective criteria in selecting CMP attendees, as he maintains. On these facts, we conclude Hare establishes a causal connection between her protected conduct and her not being selected for the CMP. Accordingly, she establishes a *prima facie* case.

The Post Office argues Burke's decision was based on objective criteria and not on any retaliatory animus against Hare. Specifically, it claims when Burke and his direct reports met to discuss potential candidates, they only considered people who had a job level of 19 or 20. Since Hare had a job level of 18, she was excluded. Hare argues this is pretext, pointing to the inclusion of an employee with a job level of 16 in an email from Burke summarizing who he and his staff had selected. The Post Office argues, however, that the lower level employee included in the email actually reported to Burke's peer and that this peer, and not Burke, selected this employee.

Hare disputes the Post Office's explanation, pointing to the language in Burke's email that introduces the list of employees selected for the program (which included the lower level employee): "As a result of yesterday's discussion at staff meeting, these are the folks that were suggested to be signed up . . . ." App. at A491. In no way does the email indicate that the lower level employee was not considered during Burke's staff

16

meeting, and Burke admits that his peer did not attend this meeting. App. at A491, A968. In addition, it appears as if a person who directly reported to Burke, not his peer, emailed him a list with the lower level employee's name on it. App. at A490. Given these discrepancies, a reasonable jury could rationally find the Post Office's asserted nonretaliatory reason unworthy of credence. Accordingly, we must reverse the District Court and remand this claim for disposition on the merits.

## 2. *Failure to Promote to POOM*

Hare next claims her not being promoted to POOM was the result of her pressing her claim. She argues she was well qualified for the POOM position, as evidenced by her high performance rating and her manager's recommending her for the position to Burke, and, despite her qualifications, Burke chose not to interview her. As evidence of causation, she points to the temporal proximity of her meeting with Burke (on March 24, 2000) and her not being selected to interview for the POOM position (on May 25, 2000). The Post Office argues that the list of people who Burke ultimately interviewed was generated by an independent committee. This committee did not include Burke or anyone else who knew of Hare's harassment claim. Accordingly, Burke did not have input into the list of interviewees and could not have excluded Hare out of retaliatory animus.

The District Court determined that not selecting Hare for the POOM job was an adverse employment decision, but it found Hare had failed to prove causation in light of the role of the independent committee. Hare disputes this finding and points to evidence that one member of the committee, John Philbin, reported directly to Burke. She

17

speculates Burke told Philbin about her claim, and, as a result, Philbin quashed her candidacy.

We agree with the District Court and find no evidence in the record that could lead a jury to reasonably find that Burke told Philbin about Hare's claim or that the committee otherwise knew about it. In his deposition, Philbin explicitly denied talking to Burke about Hare: Q. Did you say that you never talked to Ed Burke about Jamie Hare at all? A. That's correct. App. at A325. In addition, Burke testified that he did not know Philbin was on the committee because its members were kept confidential. App. at A296. Hare further claims that Philbin likely knew about Hare's complaint because he worked in the same building as Burmeister and McCullough. She points to no evidence in the record, however, that indicates that Philbin ever interacted with either of these men or that he discussed Hare's claim with them. Overall, we find the District Court properly found that Hare did not make out a *prima facie* case of retaliation based on the Post Office's not selecting her for the POOM position.

*3. Assigning a Lower Performance Rating*

Hare next claims a reasonable jury could find that her receiving a performance rating in 2001 that was lower than the one she had received in 1999 or 2000 was the result of retaliatory animus on the part of the Post Office. Hare, however, never fully develops this claim.[6] In addressing it in her brief, she argues that the assignment of a lower

---

[6]It is perhaps for this reason that the District Court did not explicitly address this claim in its opinion.

18

performance rating constitutes an adverse action, but she never directly addresses the issue of causation. *See* Hare's Br. at 51-52. In her reply brief, she argues that her accomplishments during the review period merit a higher performance rating, and she asserts that "Defendant presents no evidence to contradict Hare's explanations as to why she deserves a 'Far Exceeds' [rating]." *See* Hare's Reply Br. at 25-27.

First, we note Hare has the burden of establishing a *prima facie* case, which includes proving causation. Consequently, the Post Office need not present evidence refuting Hare's claim until she establishes a causal link. Second, beyond her own speculation and the temporal proximity of her protected conduct and her receiving a review, Hare presents no convincing evidence on which a jury could reasonably conclude that she would have received a "Far Exceeds" had she not filed claims with the EEOC. She details her achievements of 2001, but does not explain whether these achievements are similar to or better than those for which she received higher performance ratings in 1999 and 2000. Also, Hare argues that because she received a 2001 mid-year rating of "Far Exceeds" from Reiss, she should have received a similar 2001 full-year rating from Ruth. Because, however, she started a challenging new assignment in Nazareth just after this mid-year rating period, it is not necessarily true that she performed as well in the second half of the review period as she did in the first. In sum, based on this record, we cannot say that Hare has presented sufficient evidence for a jury to find that her 2001 performance rating would have been higher had she not filed claims with the EEOC.

*4. Retaliatory Harassment*

19

Finally, Hare asserts a retaliation claim predicated upon a hostile work environment. She argues the following evidence, when considered as a whole, supports her claim: (1) Burmeister (McCullough's manager) made negative comments about Hare to Reiss (Hare's manager); (2) Burke and Ruth told her that it would be in her best interest to drop her claim; (3) Burke did not select Hare for the CMP or POOM position; (4) Ruth yelled at her and treated her poorly after he found out about her claim; (5) Hare had to work excessive hours because her managers did not provide her with sufficient resources after she pursued her claim; (6) Ruth damaged her reputation in front of other Postmasters and a customer; (7) those who managed Hare after Ruth made negative comments to Hare about her claim; (8) Hare's computer password was deleted, her Post Office's utility bills were not paid, her paycheck contained an error, and she was excessively audited; (9) Hare's performance rating in the year after she made her claim (i.e., 2001) was lower than the performance ratings she had received in prior years (i.e., 1999 and 2000); and (10) Hare lost the support of her managers after she began pursuing her claim.

The District Court did not analyze Hare's retaliation claim as it related to a hostile work environment. This is likely because this Court did not recognize such a claim until *Jensen v. Potter*, 435 F.3d 444 (3d Cir. 2006), a case decided over two months after the District Court ruled on the Postmaster's summary judgment motion. In *Jensen*, this Court found that retaliation claims predicated upon a hostile work environment are cognizable under 42 U.S.C. § 2000e-3(a) in the presence of "severe and pervasive" retaliatory

20

harassment. *Id.* at 448. In light of *Burlington Northern*, however, we have since explained that such claims may go forward upon a showing by the plaintiff that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse.'" *Moore*, 461 F.3d at 341. Nevertheless, *Jensen* remains instructive. It explains that it would be improper for us to "to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus." *Jensen*, 435 F.3d at 450. It further explains that, because "it is often difficult to determine the motivations of an action[,] . . . [the] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id.* (internal quotations and citation omitted).

It may be that some of the evidence Hare cites in support of her claim cannot be considered because of hearsay problems, and much of it, standing alone, is not very persuasive. *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000) (noting that we may not consider hearsay statements on a motion for summary judgment unless they are capable of admission at trial). Furthermore, the evidence she presents may not be demonstrative of a level of harassment that is severe and pervasive. However, when we consider the evidence as a whole and under the less-demanding standard of "materially adverse," we believe there is competent evidence from which a jury could reasonably find the Post Office's actions, and particularly those that occurred while Hare worked for Ruth, were motivated out of retaliatory animus and created a hostile work environment.

Considering the facts in a light most favorable to Hare, we note that Ruth treated

21

Hare well up until he discovered she complained to the EEOC about his manager, Burke. Then, when he found out about her claim, he told her that he disapproved of it, that she was "ending her career" by pursing it, and that he did not know if he could treat her impartially in light of it. App. at A52. After telling Hare these things, Ruth began to treat her poorly. For example, he "screamed" at Hare for reporting that mail in the Nazareth Post Office had been delayed, even though Hare could lose her job for not reporting delayed mail. *See* App. at A67. When Hare's Post Office was short-staffed, Ruth refused to provide her resources that could help her meet her deadlines, even though this would seem to have been within his power. When Hare moved to Nazareth, she experienced a significant increase in the number of audits. For example, Nazareth was the subject of three to four "External First Class" audits from April 2001 to the end of 2002. In the years prior to her coming to Nazareth, Hare experienced just one of these kinds of audits. *See* App. at A69-A70. In addition, things that had never happened to Hare in the past, such as her computer login being deleted and her Post Office's utility bill not being paid, began to impede her work.

In its brief, the Postmaster General addresses many of these incidents individually and offers plausible nondiscriminatory reasons for their occurrence. We are bound, however, to consider the evidence as a whole and evaluate the "overall scenario." *Jensen*, 435 F.3d at 450. In doing this, we find it suspicious that an employee who had excelled in previous assignments and who had good working relationships with her supervisors encountered so many problems just after she told her supervisor that she had engaged in

22

protected conduct. In addition, while we agree that any one of the incidents explained above, standing alone, does not constitute adverse conduct or demonstrate retaliatory animus, the incidents, when considered together, could. In sum, we find it would not be unreasonable for a jury to conclude that Ruth treated Hare more severely than he otherwise would have because of her pressing her EEOC claim, that such treatment would deter a reasonable employee from exercising her rights, and that the Post Office's explanations for all of the problems that befell Hare after she pressed her claim are not credible. Consequently, we must remand this claim to the District Court for disposition on the merits.

*B. Gender Discrimination Claims*

Hare asserts three gender discrimination claims under 42 U.S.C. § 2000e-2(a)(1): First, she claims she was sexually harassed by McCullough. Second, she argues Burke and Burmeister discriminated against her by failing to investigate adequately her charge against McCullough. Finally, she argues McCullough, Ruth, Burke, Burmeister, and her other managers harassed her for complaining because she was a woman.[7] We address

---

[7]The District Court also analyzed whether the Post Office discriminated against Hare based on her gender when it did not select her for the POOM job or the CMP. Although Hare claims to appeal "all aspects of the below decision, except for the Equal Pay Act claim," we find no references to the POOM or CMP discrimination claims in her brief. Hare's Br. at 3. Since she did not brief these claims, we consider them waived. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) (explaining "an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal") (citation omitted). Even if we were to reach these issues, however, we would find Hare failed to make out a *prima facie* case because women were selected for the POOM job and the CMP.

23

each of these claims below. Hare also claims the Post Office discriminated against her by constructively discharging her. Again, because we find Hare was not constructively discharged, see *infra* Section III.C., we find this claim lacks merit.

*1. Sexual Harassment by McCullough*

Hare concedes that she waited more than 45 days to report her February 2000 encounter with McCullough and that this violates EEOC regulations (29 C.F.R. § 1614.105).[8] She argues, however, that her claim should be equitably tolled because Burke and other managers discouraged her from filing it. The District Court found Hare's claim could not be equitably tolled, and, for the reasons stated below, we agree with this decision.

At the outset, we note that equitable tolling "should be applied sparingly." *Podobnik v. U.S. Postal Service*, 409 F.3d 584, 591 (3d Cir. 2005) (citations and quotations omitted). Furthermore, it is only appropriate in such circumstances as the following: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994).

Hare presents no evidence on which we can equitably toll her claim. First, Hare

_____

[8]The 45-day time limit is applicable because Hare is a federal sector employee.

24

was fully aware that she had a claim. During her deposition, when asked how she felt immediately after her encounter with McCullough, she said, "I felt like I was being sexually harassed . . . ." App. at A39. Second, Hare's managers did not mislead her with respect to her claim. To the contrary, they asked her not to file a claim because they recognized that she could do so. Third, the efforts on the part of Hare's managers to dissuade her from filing a claim seem far from "extraordinary," as they consisted of simply asking her not to do so. Finally, Hare presents no evidence that she was otherwise prevented from filing a claim.

Hare also argues her sexual harassment claim against McCullough should be saved by the continuing violations doctrine. She argues his conduct should be viewed as part of a series of continuing hostile work environment violations, including Hare's poor treatment by her managers after she began pressing her claim. We disagree. Hare was immediately aware of her being sexually harassed, and, consequently, the continuing violations doctrine does not apply. *See Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003) (explaining the doctrine "does not apply when plaintiffs are aware of the injury at the time it occurred"). Accordingly, this sexual harassment claim fails because Hare did not timely report it.

*2. Gender Discrimination by Failure to Investigate*

Hare claims that, because she is a woman, Burke and others did not adequately investigate her charge that McCullough harassed her. This conduct, she claims, violates Title VII. Hare, however, does not fully develop this claim and cites no law supporting it.

25

In addition, she fails to show how the Post Office's deficient investigation constituted an "adverse employment action" under Title VII. *See Weston*, 251 F.3d at 431 (explaining that an adverse employment action "effect[s] a material change in the terms or conditions of [a person's] employment"). Accordingly, we have no basis to credit this claim.

*3. Retaliatory Harassment*

Hare claims her managers retaliated against her not just because she complained, but because she was a *woman* who complained. As Hare explains in her brief, she would not have been harassed "had [she] been male." Hare's Br. at 65. The District Court did not address this claim of Hare's.

In *Jensen*, we considered the same two types of retaliation claims raised by Hare in this appeal: one based on retaliation for protected conduct in violation of § 2000e-3(a) (discussed *supra*), and one based on gender discrimination in violation of § 2000e-2(a). With respect to the latter, we explained as follows:

> As an abstract matter, retaliation against a person based on the person's complaint about sexual harassment is not necessarily discrimination based on the person's sex. If the individuals carrying out the harassment would have carried out a similar campaign regardless of the sex of the person making the complaint, the harassment, while actionable as illegal retaliation, would not also be actionable as discrimination based on sex. In reality, however, when a woman who complains about sexual harassment is thereafter subjected to harassment based on that complaint, a claim that the harassment constituted sex discrimination (because a man who made such a complaint would not have been subjected to similar harassment) will almost always present a question that must be presented to the trier of fact. In such a situation, the evidence will almost always be sufficient to give rise to a

26

reasonable inference that the harassment would not have occurred if the person making the complaint were a man.

*Jensen*, 435 F.3d at 454.

While the record shows Hare attributed her poor treatment to her filing a complaint with the EEOC, we cannot say on the evidence before us that she would have suffered the same treatment had she been a man. Accordingly, we hold that Hare's retaliation claim based on gender discrimination should proceed on its merits.

*C. Constructive Discharge Claim*

Hare claims that conditions at the Post Office were so intolerable that she was constructively discharged. We disagree.

"Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Spencer v. Wal-Mart Stores, Inc.* 469 F.3d 311, 317 n.4 (3d Cir. 2006) (internal citation and quotation omitted). "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.* (internal quotation and citation omitted).

While we agree that the conduct Hare challenges, including the excessive audits, Ruth's yelling at her, and Ruth's refusal to allocate more resources to Hare's Post Office, made it more difficult for Hare to complete her work, there is no evidence in the record that could lead a jury to reasonably find that the Post Office's conduct was so extreme as

27

to force Hare to resign. Furthermore, we do not believe a jury could reasonably find the incident that led to Hare's departure—her manager asking her to work on one of the busiest mail days of the year (i.e., Christmas Eve)—was so outrageous as to necessitate her resignation, particularly given her role as Postmaster. Accordingly, there was no constructive discharge and Hare's damages will be limited.[9]

IV.

For the foregoing reasons, we will reverse the District Court's blanket grant of summary judgment in this case and remand for the District Court to consider Hare's retaliation claims involving her not being selected for the CMP and her managers creating a hostile work environment and her gender discrimination claim based on retaliatory harassment. In all other respects, we will affirm the Order of the District Court.

---

[9]Given that Hare was not constructively discharged, it appears that she probably will not be able to seek back pay or front pay. *See, e.g., Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001) (explaining front pay and back pay may not be awarded in the absence of an actual or constructive discharge); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1237 (10th Cir. 2000) (same); *Caviness v. Nucor-Yamato Steel Co.*, 105 F.3d 1216 (8th Cir. 1997) (same with respect to back pay). She will, however, probably be able to seek compensatory damages and attorneys fees and costs.