

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-2006

# Jensen v. Postmaster General

Precedential or Non-Precedential: Precedential

Docket No. 04-4078

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Jensen v. Postmaster General" (2006). *2006 Decisions.* Paper 1654.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1654

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4078

ANNA M. JENSEN,

Appellant

v.

JACK E. POTTER,
POSTMASTER GENERAL US POSTAL SERVICE

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Dist. Ct. No. 03-cv-01201)
District Court Judge: Hon. Richard P. Conaboy

Argued: September 29, 2005

Before: ALITO and AMBRO, <u>Circuit Judges</u>, and RESTANI,[*]
<u>Chief Judge</u>, United States Court of International Trade

(Opinion Filed January 31, 2006)

KIMBERLY D. BORLAND

---

[*]Honorable Jane A. Restani, Chief Judge of the United
States Court of International Trade, sitting by designation.

DAVID P. TOMASZEWSKI (Argued)
Borland & Borland
69 Public Square, 11th floor
Wilkes Barre, PA 18701

*Counsel for Appellant*

J. JUSTIN BLEWITT, JR. (Argued)
Assistant United States Attorney
Federal Building
235 N. Washington Ave.
P.O. Box 309
Scranton, PA 18501

*Counsel for Appellee*

---

OPINION OF THE COURT

---

ALITO, Circuit Judge

Appellant Anna Jensen is a letter carrier with the Kingston, Pennsylvania branch of the United States Post Office. In this action against her employer, she brings claims for retaliation and sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The District Court granted the Postmaster General's motion for summary judgment as to both claims, and Jensen appealed.

We will reverse and remand. With respect to retaliation, the District Court incorrectly held that coworker harassment cannot violate 42 U.S.C. § 2000e-3(a). As to sex discrimination, the record contains evidence sufficient to support a finding that the alleged retaliatory harassment was also discrimination "because of . . . sex." See 42 U.S.C. § 2000e-2(a).

I.

Both Jensen's claims arise from a series of events that began with an unwanted sexual proposition. While at work on Saturday morning, September 15, 2001, Jensen received a phone call from supervisor Carl Waters. Waters had the day off, and he asked if Jensen knew the way to his home. When Jensen said she didn't, he gave her directions. As he spoke, Waters struggled with the pronunciation of certain street names. He apologized to Jensen and attributed the slurred speech to an all-night drinking binge.

After completing the directions, Waters said: "Now Anna, I don't care what [obscenity] you go in and tell those guys in the office, get out of there right now [because] I want to make love to you all day long." App. 63. Jensen declined, but Waters persisted, asking her at least to join him for breakfast. Jensen again said no, and Waters responded: "Anna, you put me in a compromising position." App. 63. Jensen made it clear that her decision was final, and the conversation ended.

The next day, Jensen phoned Kingston branch manager Chris Moss and reported the incident. A more detailed discussion occurred when Jensen returned to work on Tuesday the 18th. Waters continued to work at the Kingston branch for two more days, but Jensen and he did not interact. On Thursday the 20th, the Postal Service transferred Waters to the Ashley branch. An investigation followed, and in January 2002 Waters was fired.

Meanwhile, on September 26, 2001, supervisor Rick Honeychurch moved Jensen's workstation from Moss's office to a stand-up desk in an area of the Post Office called Unit 1. Jensen's stay in Moss's office had begun after an injury required the use of crutches and the elevation of Jensen's leg. Moss testified that he instructed Honeychurch to move Jensen for two reasons: her leg had healed and he had confidentiality concerns about the pending Waters investigation. For her part, Jensen heard third-hand that Moss feared being alone with her. Whatever the reason, Jensen's new desk was the former workspace of Carl Waters, and her reception in Unit 1 was not friendly.

Right away, letter carrier Joe Sickler began to pepper Jensen with insults. On September 26, he referred to Jensen as "the

[obscenity] who got [Waters] in trouble." App. 65. He then remarked within Jensen's earshot that she would have to get off her "fat [obscenity]" once a new supervisor arrived. The next day, Jensen overheard Sickler discussing a proposed petition to bring Waters back. Sickler also stated that Waters should not have to apologize for anything. Some time later, Sickler crept up behind Jensen and clapped two objects together. Startled, Jensen cringed with fright. She then reported Sickler's behavior to Moss and asked to be removed from Unit 1. Moss said he would talk to Sickler, but he declined to move Jensen despite the availability of another workstation. When asked at his deposition to explain why he did not move Jensen, Moss answered: "Because I didn't." App. 195. Sickler's offensive comments continued at a pace of two to three times per week for about 19 months.

Besides Sickler, letter carrier Ed Jones, a friend to Jensen before she reported Waters, now threatened her by driving U-Carts toward her at a rapid pace. He also told Jensen that he disagreed with the decision to terminate Waters. Approximately one year after the Waters incident, unknown vandals twice scratched Jensen's car with a key, spit on the car, and spilled coffee on it. All the incidents occurred in the Post Office parking lot; before the Waters telephone call vandals had never victimized Jensen.

In addition to her initial request to leave Unit 1, Jensen repeatedly complained to Moss and Honeychurch about her coworkers' behavior. At some point during the relevant period—exactly when is unclear—Honeychurch claims to have confronted Sickler about his offensive comments. Conditions did not improve, however, until 19 months after Jensen's first complaint. At that time, Jensen complained to a new supervisor, Melissa White. White brought Jensen into Moss's office, and Jensen again detailed her treatment at the hands of coworkers. Moss, White, and union officials then confronted Sickler, and Jensen's troubles quickly abated.

During this 19-month period, Jensen suffered panic attacks, she used sick time because of stress, and her asthma caused trips to the emergency room. She attributes these problems to working conditions at the Post Office.

4

Based on these events, Jensen brought two claims: sex discrimination pursuant to 42 U.S.C. § 2000e-2(a), and retaliation under 42 U.S.C. § 2000e-3(a). The District Court granted the defendant's motion for summary judgment on both claims, and this appeal followed. Our review is plenary, and we view the facts in the light most favorable to Jensen. See United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 396 n.3 (3d Cir. 2003). If a reasonable jury could find for her, we must reverse. Neumeyer v. Beard, 421 F.3d 210, 213 (3d Cir. 2005).

## II.

Jensen claims that her employer is liable for her coworkers' actions under Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a). That provision makes it an unlawful employment practice to "discriminate" against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."[1] The parties dispute both the scope of this prohibition and its application to this case. As a result, we must first clarify § 2000e-3(a)'s meaning and then apply those principles to the record before us.

## A.

The threshold question is whether a retaliation claim predicated upon a hostile work environment is cognizable under 42 U.S.C. § 2000e-3(a). Jensen says it is, the Postmaster says it isn't, and our sister circuits are split. A majority has held that the statute prohibits severe or pervasive retaliatory harassment. See Noviello v. City of Boston, 398 F.3d 76, 90 (1st Cir. 2005); Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001); Ray v. Henderson, 217 F.3d 1234, 1244-45 (9th Cir. 2000); Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998); Knox v. Indiana, 93 F.3d 1327, 1334-35 (7th Cir. 1996); see

---

[1]The parties agree that Jensen "made a charge . . . under [Title VII]" when she reported the Waters phone call to branch manager Chris Moss. See 42 U.S.C. § 2000e-3(a).

5

also Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791-92 & n.8 (6th Cir. 2000) (holding that retaliatory harassment by a supervisor is actionable but "tak[ing] no position on whether an employer can be liable for coworkers' retaliatory harassment"). The Fifth and Eighth Circuits, however, limit § 2000e-3(a) to "ultimate employment decisions," and thus do not view harassment to be within the statute's reach. See Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997); Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997).

While our Court has never addressed the precise question, the logic of our decision in Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997), points toward the majority approach. In Robinson, we held that "[r]etaliatory conduct other than discharge or refusal to rehire" violates Title VII when it "alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities', or 'adversely affect[s] his [or her] status as an employee.'" Id. at 1300 (quoting 42 U.S.C. § 2000e-2(a)) (alterations in original). Put another way, § 2000e-3(a) prohibits a quantum of discrimination coterminous with that prohibited by § 2000e-2(a). Id. at 1300-01; see also Von Gunten, 243 F.3d at 865 (rejecting the Fifth Circuit's ultimate employment decision standard because "conformity between the provisions of Title VII is to be preferred") (internal quotation omitted).

Under § 2000e-2(a), the cognizability of a discrimination claim founded upon a hostile work environment is well-established. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (sex); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) (same); Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (race); Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2005) (national origin); Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 276-77 n.5 (3d Cir. 2001) (religion). The statutory basis for these claims is the notion that discriminatory ridicule or abuse can so infect a workplace that it alters the terms or conditions of the plaintiff's employment. See Meritor, 477 U.S. at 67. If harassment can alter the terms or conditions of employment under § 2000e-2, then Robinson teaches that the same is true under § 2000e-3. See Robinson, 120 F.3d at 1300-01. We thus hold that both provisions can be offended by harassment that is severe or pervasive enough

6

to create a hostile work environment.

B.

In light of the consistency between the two provisions, our usual hostile work environment framework applies equally to Jensen's claim of retaliatory harassment. Thus, Jensen must prove that (1) she suffered intentional discrimination because of her protected activity;[2] (2) the discrimination was severe or pervasive;[3]

---

[2]This element differs in wording, but not in substance, from our usual retaliation test's requirement of a "causal connection" between the protected activity and the adverse employment action. See Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995). By showing a causal link, the plaintiff raises an inference of retaliatory intent and satisfies her initial burden under the McDonnell Douglas framework. See Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997). The ultimate question in any retaliation case is an intent to retaliate *vel non*. See Shaner v. Synthes, 204 F.3d 494, 501 n.8 (3d Cir. 2000).

[3]We have often stated that discriminatory harassment must be "pervasive and regular." See, e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). But the Supreme Court's standard is "severe *or* pervasive." Pa. State Police v. Suders, 542 U.S. 129, 133 (2004) (emphasis added); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); Harris, 510 U.S. at 21; Meritor, 477 U.S at 67. The difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[I]solated incidents (*unless extremely serious*) will not amount to discriminatory changes in the terms and conditions of employment.") (emphasis added, internal quotation omitted); see also 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, Employment Discrimination Law and Practice 455 (3d ed. 2002) ("The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not

7

(3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. See Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001); Robinson, 120 F.3d at 1300-01.

The test's first element concretely expresses the principle that Title VII is not "a general civility code for the American workplace." See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998). Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief. This first step, therefore, requires us to identify what harassment, if any, a reasonable jury could link to a retaliatory animus. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Shaner v. Synthes, 204 F.3d 494, 500-01 (3d Cir. 2000); cf. Aman v. Cort Furniture, 85 F.3d 1074, 1081-83 (3d Cir. 1996).

In determining whether conduct was retaliatory, our cases have tended to focus on two factors: (1) the "temporal proximity" between the protected activity and the alleged discrimination and (2) the existence of "'a pattern of antagonism in the intervening period.'" See Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)). Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive," but even if "temporal proximity. . . is missing, courts may look to the intervening period for other evidence of retaliatory animus." Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997). Despite this focus, "[t]hese are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Farrell, 206 F.3d at 280; see also Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.").

---

pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.").

This same principle applies in our hostile work environment cases under § 2000e-2(a).  There, we have deemed it improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus.  See, e.g., Cardenas, 269 F.3d at 260-61; Aman, 85 F.3d at 1081-84.  Because "it is often difficult to determine the motivations of an action[,] . . . . [the] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."  Andrews, 895 F.2d at 1484.

With these principles in mind, we turn to the summary judgment record before us.  The prime antagonist in Jensen's retaliation claim is letter carrier Joe Sickler.  Shortly after Waters's transfer to the Ashley office, Sickler called Jensen "the [obscenity] who got [Waters] in trouble;" he also stated that when a new supervisor came Jensen would have to get off her "fat [obscenity]."  App. 65.  Because these insults directly relate to Jensen's complaint against Waters, they raise an obvious inference of retaliatory animus. Cf. Andrews, 895 F.2d at 1482 n.3 ("The intent to discriminate on the basis of sex in cases involving. . . sexually derogatory language is implicit, and thus should be recognized as a matter of course.").  More important, these statements may provide a window into Sickler's thinking throughout the 19-month barrage of offensive comments.  If Sickler's conduct were viewed in isolation, his motives would be unclear, but his earlier statements provide a reasonable basis for thinking that the later abuse resulted from latent hostility to Jensen's whistleblowing.  Thus, the record as a whole supports a finding that all of Sickler's harassment was based on a retaliatory animus.

Jensen also alleges physical threats by letter carrier Ed Jones.  Like Sickler's loud and frightening clap, Jones's alleged assaults are facially neutral. Nonetheless, the record contains other evidence from which a factfinder could infer motive.  First, before the Waters incident, Jensen and Jones were friends; shortly after it, Jones menaced her with heavy equipment.  This temporal proximity between the protected activity and Jones's changed behavior is probative of a retaliatory intent.  See Abramson, 260 F.3d at 288.  Second, the record contains evidence that Jones expressed disagreement with the decision to remove Waters. This statement, when combined with the sudden shift in behavior,

9

permits an inference that Jones's newfound hostility resulted from Jensen's protected activity.

In addition to Sickler's habitual insults and Jones's threatening use of postal equipment, Jensen alleges that vandals twice keyed her car, spit on it, and spilled coffee on it. Standing alone, these acts of vandalism contain no indicia of retaliation. But as with the other events, the analysis changes significantly upon consideration of the overall scenario. See Andrews, 895 F.2d at 1482 n.3. Though the vandalism did not begin until approximately one year after Jensen reported Waters, Sickler's berating of Jensen allegedly continued even 19 months after the Waters incident. If true, and we assume it to be so on summary judgment, this intervening antagonism tends to show that these seemingly unrelated incidents were components of an integrated pattern of retaliation. See Abramson, 260 F.3d at 288-89; cf. Aman, 85 F.3d at 1083 (concluding that, in light of racially abusive remarks, a reasonable jury could infer that facially neutral acts like stealing time cards were "part of a complex tapestry of discrimination"). In sum, a reasonable jury could find that all the alleged coworker harassment—namely, Sickler's insults, Jones's physical threats, and vehicle damage caused by unknown vandals—were the product of intentional discrimination because of Jensen's protected activity.

Having identified the conduct that a reasonable jury could label retaliatory, our next task is to measure the harassment's severity or pervasiveness. As stated earlier, this inquiry has both subjective and objective components. See Faragher, 524 U.S. at 787. We can quickly dispense with the subjective prong. At her deposition, Jensen testified that her coworkers' actions caused anxiety attacks, trips to the emergency room, and stress-induced use of her sick leave. App. 129-30, 136-38. This evidence would support a finding that Jensen subjectively viewed the work environment to be hostile. See Harris, 510 U.S. at 21-22.

Of course, Jensen's subjective reaction to the discrimination is not enough. She must also show an objectively hostile work environment. Two elements of our test relate to this question. The second prong requires severe or pervasive harassment; the fourth requires discrimination that would have detrimentally affected a

10

reasonable person. See ante at 7-8. When applied, they coalesce into a single inquiry: did the plaintiff suffer retaliatory harassment severe or pervasive enough to "alter the conditions of [her] employment and create an abusive working environment"? See Meritor, 477 U.S. at 67; Robinson, 120 F.3d at 1300-01.

Like the requirement of intentional discrimination, the need for an objectively abusive work environment further distinguishes Title VII from a generalized "civility code." Oncale, 523 U.S. at 81. The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not "permeate" the workplace and change the very nature of the plaintiff's employment. See Faragher, 524 U.S. at 788; Harris, 510 U.S. at 21. Factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. No one factor is dispositive, and the analysis must focus on the "totality of the circumstances." Andrews, 895 F.2d at 1482.

While the severe or pervasive standard applies equally to § 2000e-2 and § 2000e-3, it is especially crucial in the retaliation context. When one employee makes a charge under Title VII against another, some strain on workplace relationships is inevitable. See Von Gunten, 243 F.3d at 870. Sides will be chosen, lines will be drawn, and those who were once the whistleblower's friends may not be so friendly anymore. See Noviello, 398 F.3d at 92-93. But what the statute proscribes is retaliation, not loyalty to an accused coworker or a desire to avoid entanglement in workplace controversy. Id.; see also Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action."). Thus, while we must consider the totality of the circumstances, some circumstances do not affect our analysis because they are not retaliatory.

For example, at her deposition, Jensen frequently stated that coworkers subjected her to the silent treatment. See, e.g., Doc. 23,

11

Exhibit D, Jensen Deposition at 97 ("I mean, the whole environment was different after I reported it, okay. People who used to talk to me didn't talk to me."). A cold shoulder can be hurtful, but it is not harassment. See Brooks, 229 F.3d at 929.

Mere expressions of opinion are also not retaliatory. For example, Jensen overheard Sickler discussing "a petition. . . to bring Carl [Waters] back and that Carl shouldn't have to apologize for anything." App. 65-66. On another occasion, Ed Jones told Jensen that he disagreed with the decision to fire Waters. App. 114-16. These statements are useful to Jensen because they tend to show that a retaliatory motive animated *other* behavior by Sickler and Jones. But they have no independent weight in our "severe or pervasive" analysis. If Jones thought Waters had been treated harshly, he was entitled to express his opinion; if Sickler wanted to start a petition, he had every right to do so. Title VII prohibits retaliation against accusers, not support for the accused.

Nonetheless, the record contains evidence of harassment that a jury might well find severe or pervasive. First, Sickler berated Jensen with retaliatory insults two to three times per week for 19 months, and the significance of these remarks lies in their pounding regularity. See Harris, 510 U.S. at 23. Second, the record contains evidence of more than just insults. Jensen also testified to an unspecified number of physical threats by Ed Jones and at least four instances of property damage to her vehicle. These incidents' severity and the insults' frequency combine to raise a material question of fact as to whether retaliatory harassment "permeated" the workplace and changed the terms or conditions of Jensen's employment. See id. at 21.

With that, we come to the fifth and final prong of the analysis: employer liability. Under Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher, 524 U.S. at 807-08. When coworkers are the perpetrators, the plaintiff must prove employer liability using traditional agency principles. Weston, 251 F.3d at 426-27; Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 106-07 (3d

Cir. 1994).  Typically, the plaintiff in a coworker harassment case argues for direct liability on a theory of "negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment."  See Bouton, 29 F.3d at 106 (citing Restatement (Second) of Agency § 219(2)(b)).  That is what Jensen argues here, so we will analyze this case as one of coworker harassment. See Pl. Br. at 26.[4]

In order to establish employer negligence, the plaintiff must show that management knew or should have known about the harassment, but "failed to take prompt and adequate remedial action."  Andrews, 895 F.2d at 1486.  An effective remedy—one that stops the harassment—is adequate per se.  Knabe v. Boury Corp., 114 F.3d 407, 411-12 n.8 (3d Cir. 1997).  Even if not

---

[4]Though Jensen does not argue that the Faragher/Ellerth analysis applies, the proper standard may be an open question. After Waters's transfer to the Ashley office, supervisor Rick Honeychurch (at the apparent direction of Chris Moss) moved Jensen's workspace to Waters's old desk.  Jensen claims this was done "to put [her] in a position of extreme vulnerability where coworkers supportive of Waters would foreseeable [sic] harass [her]." Pl. Br. At 8.  Assuming *arguendo* that the record contains evidence to support this inference, two questions arise. First, which liability standard applies when a supervisor intentionally facilitates coworker harassment? Second, is Rick Honeychurch (or, perhaps, Chris Moss) a "supervisor" for purposes of Faragher/Ellerth? See Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1033 (7th Cir. 1998) (stating that courts must "distinguish[] employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers"); Compare Id. at 1034 (holding that a "supervisor" must have "at least some" authority to "hire, fire, demote, promote, transfer, or discipline an employee"), with Mack v. Otis Elevator Co., 326 F.3d 116, 125 (2d Cir. 2003) (disagreeing with Parkins and holding that a "supervisor" is a person given authority that "enabled or materially augmented [his or her] ability. . . to create a hostile work environment"). These are interesting questions, but we need not decide them. The parties do not raise them, and Jensen survives summary judgment under the more onerous coworker harassment standard.

effective, an employer's remedial measure is nonetheless adequate if "reasonably calculated" to end the harassment. Id. at 412-13 (internal quotation omitted). Moreover, the remedy need not include discipline to be adequate. In Knabe, for example, the employer found insufficient evidence of harassment to justify disciplinary measures against the offending employee. Id. at 413. Nonetheless, because the employer promptly met with the alleged harasser and informed him of the company's strong policy against sexual harassment, we found the remedy adequate as a matter of law. Id.

Here, as in Knabe, the defendant held a meeting with the principal harasser and discussed the allegations. See id. Furthermore, this meeting was effective—it stopped the harassment. See id. at 412 n.8. But to be reasonable the remedy must be both adequate *and* prompt. Andrews, 895 F.2d at 1486. Though Moss and Honeychurch claim to have had informal discussions with Sickler, the formal meeting between management, union officials, and Sickler did not occur until April or May of 2003. The effectiveness of so modest a remedial measure raises a question as to why, despite Jensen's repeated complaints, it took 19 months of harassment and the intervention of a new supervisor to make it happen. Because of this delay, we cannot deem the Postal Service's response prompt and adequate as a matter of law.

In sum, the record raises genuine issues of material fact as to all five elements of our hostile work environment test. We therefore reverse the District Court's order granting summary judgment for the defendant on the retaliation claim.

## III.

The District Court also granted summary judgment for the defendant on Jensen's sex discrimination claim. Despite the consistency between § 2000e-2(a) and § 2000e-3(a), and despite the fact that both Jensen's claims arise from a single series of events, separate analysis is still necessary. Section 2000e-2(a) makes it an unlawful employment practice to discriminate based on "race, color, religion, sex, or national origin." As such, this claim stands or falls on whether Jensen suffered sex discrimination severe or pervasive enough to have changed the terms or conditions of her

employment. <u>Harris</u>, 510 U.S. at 21.

Our task, then, is to identify the alleged harassment that a reasonable jury might deem intentional discrimination because of sex. <u>Weston</u>, 251 F.3d at 426. When harassment is facially sexual, i.e., when it "involv[es] sexual propositions, innuendo, pornographic materials, or sexually derogatory language," an inference of sex-based intent will usually arise. <u>Andrews</u>, 895 F.2d at 1482 n.3; <u>see also</u> <u>Oncale</u>, 523 U.S. at 80. But discrimination comes in many forms, and it need not be overtly sexual to be actionable. <u>See</u> <u>Andrews</u>, 895 F.2d at 1485. As with our search for a retaliatory animus, we do not view each incident in isolation, but attempt to divine the existence of sex-based intent by considering the "overall scenario." <u>Id</u>. at 1484.

Both parties agree that Waters's proposition raises an inference of intentional sex discrimination. Waters told Jensen to come to his house for the purpose of "mak[ing] love." The inference that he did so because Jensen is a woman arises as a matter of course. <u>See</u> <u>id</u>. at 1482 n.3.

The disputed terrain is whether any of the harassment that followed the Waters incident—harassment that we have already decided a reasonable jury might find retaliatory—was sex discrimination. Jensen argues that because the Waters phone call triggered all the harassment that followed, it was all "because of . . . [her] sex." Pl. Br. at 13-14. The defendant contends that, outside the Waters incident, the record contains no indicia of sex-based intent.

As an abstract matter, retaliation against a person based on the person's complaint about sexual harassment is not necessarily discrimination based on the person's sex. If the individuals carrying out the harassment would have carried out a similar campaign regardless of the sex of the person making the complaint, the harassment, while actionable as illegal retaliation, would not also be actionable as discrimination based on sex. In reality, however, when a woman who complains about sexual harassment is thereafter subjected to harassment based on that complaint, a claim that the harassment constituted sex discrimination (because a man who made such a complaint would not have been subjected

15

to similar harassment) will almost always present a question that must be presented to the trier of fact. In such a situation, the evidence will almost always be sufficient to give rise to a reasonable inference that the harassment would not have occurred if the person making the complaint were a man. The difficult task of determining whether to draw such an inference in a particular case is best left to trial.

For these reasons, we hold that the plaintiff's claim of sex discrimination, like her claim of retaliation, should not have been rejected at the summary judgment stage.

## IV.

We reverse the District Court's judgment and remand the case for further proceedings.