OPINION OF THE COURT
ELLIS, Senior District Judge.
Shawn Brooks appeals from the District Court’s grant of summary judgment in favor of his former employer on the employment discrimination claims he brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. Because we agree with the District Court that the record does not contain evidence from which a jury could reasonably conclude that Brooks was subjected to a hostile work environment or constructively discharged, we will affirm.
I.
Because we write solely for the benefit of the parties, we only briefly summarize the essential, undisputed facts. In September 2000, Shawn Brooks began working as an account executive for Infinity Broadcasting Corporation (“Infinity”), a corporation which is now named CBS Radio, Inc. (“CBS Radio”). In that position, Brooks sold advertising on radio station WYSP in connection with its broadcast of Philadelphia Eagles football games. Among the approximately twenty-five account executives at WYSP, Brooks was the only African-American. Brooks’s immediate supervisor was Joseph Zurzolo, the Eagles Radio Network’s Sales Manager. Zurzolo was supervised by Peter Kleiner, WYSP’s General Sales Manager, who was in turn supervised by Ken Stevens, WYSP’s General Manager.
On May 9, 2001, Zurzolo held a sales meeting with the account executives for the Eagles Radio Network. During the meeting, Zurzolo distributed a book entitled New Dress for Success and stated, “Per human resources, use it.” Zurzolo distributed the book, which was recommended to him by Jeffrey Snodgrass, WYSP’s Sports Sales Manager, because he felt one of the account executives, a white female, was dressing too casually at work. Zurzolo did not read the book before distributing it.
After reading New Dress for Success, Brooks was offended by a number of the book’s passages.[1] On May 10, 2001, *773 Brooks called Sandy Shields, WYSP’s Business Manager and Human Resources Director, to complain about the book. Shields told Brooks that he had a right to be upset and that she would look into the matter. Shields contacted Stevens, who instructed her to collect all copies of the book that had been distributed to the station’s employees. Shields then contacted Kleiner, and together they collected all copies of the book, except for Brooks’s copy. Kleiner also verbally reprimanded Zurzolo for distributing New Dress for Success without reading it first. One week after the book’s distribution, Kleiner attended an Eagles Radio Network sales meeting and told the staff that the book did not represent the views of Infinity, himself, or Zurzolo, who had not read the book prior to its distribution. Brooks, who after the book’s distribution returned to the office only once, on May 28, 2001, to submit a resignation letter and collect his personal items, was not present and did not know that Kleiner had addressed the staff regarding the book’s distribution.
Following two additional telephone conversations with Shields on May 10 and May 11, 2001, Brooks felt Shields was not going to resolve the matter adequately. Although Zurzolo and Kleiner left several phone messages for Brooks asking him to call them, Brooks never communicated with any of his supervisors about the book’s distribution because he did not trust them. Zurzolo had offended Brooks on a number of occasions prior to the book’s distribution. Specifically, Brooks makes the following additional allegations, which CBS Radio does not dispute for summary judgment purposes:
(i) On one occasion, Zurzolo made a comment to Brooks about “having to go with [Brooks’s] fiancée,” a statement perceived by Brooks to mean that Zur-zolo wanted to have sex with his fiancée.
(ii) On several occasions, Zurzolo “palmed,” or put his hand on, the head of an African-American receptionist, a gesture Brooks viewed as racially offensive.
(iii) On several occasions, Zurzolo used ethnic slurs, including “dago,” in reference to himself.
(iv) On one occasion, Zurzolo inappropriately touched an African-American receptionist while on a sales call.
*774 (v) On one occasion, someone stole a promotional banner relating to Brooks’s ING Direct account, an act Brooks perceived as racially motivated.
Although Infinity had adopted a non-discrimination and anti-harassment policy that encouraged employees to report offensive conduct, Brooks did not tell anyone in the office about these incidents because he felt such conduct was tolerated and accepted.[2]
On May 16, 2001, Brooks filed a complaint with the Pennsylvania Human Relations Commission (“PHRC”), for dual filing with the EEOC, alleging that Infinity had discriminated against him based on his race in violation of the Pennsylvania Human Relations Act by (i) subjecting him to a hostile work environment and (ii) causing his constructive discharge. Brooks’s administrative complaint did not identify any allegation of harassment other than the book’s distribution. After the PHRC found probable cause to believe the book’s distribution violated the Pennsylvania statute and after the parties engaged in discovery, the PHRC held a public hearing on November 6 and November 7, 2003, before a hearing panel of three commissioners. At the hearing, Brooks testified about the book’s distribution, as well as the other incidents of conduct he found offensive.
On February 28, 2005, the PHRC hearing panel issued findings of fact, conclusions of law, and an opinion, all of which were adopted by the full PHRC in its final order. Relying on both the book’s distribution and three of Brooks’s additional allegations of harassment, the PHRC found Brooks had established both his hostile work environment claim and his constructive discharge claim and awarded him $614,262 in economic damages.
On April 5, 2005, Infinity petitioned the Commonwealth Court of Pennsylvania to review the PHRC’s decision. After the petition was granted, Brooks joined in the PHRC’s brief and participated in oral argument. On February 9, 2006, the Commonwealth Court reversed the PHRC’s decision, finding (i) that the PHRC should have considered only the book’s distribution because Brooks did not include the additional allegations of harassment in his PHRC complaint; and (ii) that the book’s distribution was not sufficiently severe or pervasive to create a hostile work environment or cause constructive discharge. The Pennsylvania Supreme Court denied the petitions for review filed by the PHRC and Brooks.
On February 7, 2007, Brooks filed this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. CBS Radio filed a motion to dismiss on the ground that Brooks’s action was foreclosed by the doctrine of issue preclusion and alternatively sought summary judgment. Although the District *775 Court denied the motion to dismiss,[3] it granted CBS Radio’s motion for summary judgment. Brooks timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
II.
Summary judgment is appropriate only where, on the basis of the undisputed material facts, the moving party is entitled to judgment as a matter of law. See Rule 56(c), Fed.R.Civ.P.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the facts must be viewed, and all reasonable inferences must be drawn, in the light most favorable to the non-moving party. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080-81 (3d Cir.1996). Where, as here, the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment on showing that there is a lack of evidence to carry the non-moving party’s burden on an essential element of that party’s cause of action. See Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548. Our review of the grant of summary judgment is plenary. Moore v. City of Phila., 461 F.3d 331, 340 (3d Cir.2006).
III.
The principles guiding our analysis of Brooks’s hostile work environment claim are clear. To establish a Title VII claim for employment discrimination based on race and due to a hostile work environment, a plaintiff must show (1) that he suffered intentional discrimination because of race; (2) that the discrimination was severe or pervasive; (3) that the discrimination detrimentally affected him; (4) that the discrimination would have detrimentally affected a reasonable person of the same race in his position; and (5) that there is a basis for vicarious liability. See Jensen v. Potter, 435 F.3d 444, 449 & n. 3 (3d Cir.2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir.2005). Properly conducted, this analysis “must concentrate not on individual incidents, but on the overall scenario.” Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir.2001) (internal quotation marks and citations omitted); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (“[W]hether an environment is ‘hostile’ or ‘abusive’ can be determined only by looking at all the circumstances.”).
In this case, the District Court’s analysis of Brooks’s hostile work environment claim focused on the first two elements, and the District Court determined that a reasonable jury could neither find that Brooks had suffered intentional discrimination because of his race nor conclude that he had encountered severe or pervasive harassment. Viewing all of the facts in the light most favorable to Brooks, we agree that Brooks’s hostile work environment claim cannot survive a motion for summary judg *776 ment. First, a reasonable jury could not find from the record evidence that the incidents of harassment of which Brooks complains were motivated by a racially discriminatory animus. To be sure, the incidents of record may well suggest that Zurzolo was far from a model supervisor and repeatedly exercised poor judgment, including on the occasion when he distributed a book he had not read that contained racially offensive passages. Yet, importantly, Title VII does not represent “ ‘a general civility code for the American workplace’ ” and instead provides relief only to employees who suffer severe or pervasive harassment because of a reason prohibited by Title VII. Jensen, 435 F.3d at 449 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Here, there is simply nothing to suggest that Zurzolo or any other CBS Radio employee intentionally discriminated against Brooks because of his race.[4]
Moreover, even assuming Brooks could establish that he suffered intentional discrimination because of his race, his hostile work environment claim would still fail because it is pellucidly clear that the incidents he has identified do not constitute the kind of severe or pervasive harassment required by Title VII. See Harris, 510 U.S. at 21-22, 114 S.Ct. 367. It is well established that to prove the second element of a hostile work environment claim, a plaintiff must show that his workplace was “permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal quotation marks and citation omitted). Further, it is not sufficient for Brooks to have subjectively perceived the harassment as severe or pervasive; the conduct in question must also be so severe or pervasive that it creates an objectively hostile work environment. See Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir.2001).[5] In this respect, it is clear *777 that “[o]ecasional insults, teasing, or episodic instances of ridicule are not enough; they do not ‘permeate’ the workplace and change the very nature of the plaintiffs employment.” Jensen, 435 F.3d at 451. In determining whether harassment is sufficiently severe or pervasive to give rise to a Title VII action, courts must “look[ ] at all the circumstances,” including “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Harris, 510 U.S. at 23, 114 S.Ct. 367.
These principles, applied here, compel the conclusion that no reasonable jury could find that Brooks experienced racial harassment so severe or pervasive that it “alter[ed] the conditions of [his] employment and create[d] an abusive environment.” Morgan, 536 U.S. at 116, 122 S.Ct. 2061. Although Brooks was understandably offended by the contents of the book he was instructed by Zurzolo to read and follow, the record is clear that Zurzolo did not know about the book’s offensive passages and that employees were quickly informed that the book did not reflect the views of the company or their supervisors. Given this, the distribution of New Dress for Success does not represent sufficiently severe harassment to support a Title VII hostile work environment claim. Nor does this conclusion change when the other incidents of which Brooks complains are taken into account. The harassment Brooks alleges he faced in his workplace was not particularly frequent and was certainly not physically threatening or humiliating; indeed, it is difficult to conceive how the alleged harassment would have had any real interference with Brooks’s work performance. In short, all of the alleged incidents, taken together and viewed in the light most favorable to Brooks, fail to establish that the workplace at WYSP was “permeated with discriminatory intimidation, ridicule, and insult” such that the nature of Brooks’s employment was changed, and the District Court’s grant of summary judgment on Brooks’s hostile work environment claim was appropriate for this reason alone. Id.
We reach the same conclusion for essentially similar reasons with respect to Brooks’s constructive discharge claim. To establish constructive discharge, a plaintiff must show that “the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.” Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir.1984); see also Aman, 85 F.3d at 1084. Here, Brooks cannot rely on any of the indicators often raised by employees who assert constructive discharge claims. He was never threatened with discharge, nor did CBS Radio ever urge or suggest he resign or retire. He was not demoted, and his pay and benefits were not reduced. He was not involuntarily transferred to a less desirable position, his job responsibilities were not altered in any way, and he was not given unsatisfactory job evaluations. See Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.1993) (noting, in reversing judgment in favor of plaintiffs constructive discharge *778 claim, that plaintiff could not show the above-named factors). Additionally, “a reasonable employee will usually explore ... alternative avenues thoroughly before coming to the conclusion that resignation is the only option.” Id. Yet, Brooks stopped coming to work immediately after the book’s distribution and had no communication with any of his supervisors about any of the incidents. Moreover, given our conclusion that Brooks has failed to present any evidence of intentional racial discrimination or of severe or pervasive harassment, it follows that a reasonable person in Brooks’s position would not have felt compelled to resign. Accordingly, the District Court appropriately granted CBS Radio’s motion for summary judgment as to Brooks’s constructive discharge claim.
In addition to his arguments that the District Court erred in determining that a jury could not reasonably conclude that he was subjected to a hostile work environment or constructively discharged, Brooks’s primary contention in this appeal is that the District Court erred in considering facts that were not explicitly found by the PHRC. Brooks’s argument, distilled to its essence, is that (i) because, under Pennsylvania state law, a state court reviewing a PHRC decision is limited to determining whether “substantial evidence” exists to support the PHRC’s findings, see Harrisburg Sch. Dist. v. Pennsylvania Human Relations Comm’n, 77 Pa.Cmwlth. 594, 596, 466 A.2d 760 (1983), and (ii) because federal law “requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged,” Kremer v. Chem. Constr. Corp., 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), the PHRC’s factual findings have preclusive effect in this action and, moreover, represent the only facts that could be considered by the District Court. Although Brooks’s two premises are correct, the conclusion he wishes us to draw plainly does not follow. First, while it is clear that a state court’s judgment affirming a state administrative agency’s determination is entitled to preclusive effect in a subsequent Title VII action under 28 U.S.C. § 1738, see Kremer, 456 U.S. at 463, 102 S.Ct. 1883, it is equally well established that unreviewed state administrative proceedings do not receive preclusive effect on Title VII claims brought in federal court, see Univ. of Tenn. v. Elliott, 478 U.S. 788, 796, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). Here, although the state administrative proceeding was reviewed by a state court, that state court reversed the PHRC’s decision. Given this, the PHRC’s findings of fact clearly cannot be given the preclusive effect that Brooks asserts. Moreover, even if the Pennsylvania Commonwealth Court had affirmed the PHRC’s decision and the PHRC’s findings were accordingly entitled to receive preclu-sive effect in federal court, they would not, as Brooks suggests, become the factual record or the sole facts the District Court could consider. Rather, under settled Pennsylvania principles of issue preclusion, the parties would be foreclosed from relit-igating “ ‘an issue of fact or law which was actually litigated and which was necessary to the original judgment.’ ” Dici v. Pennsylvania, 91 F.3d 542, 548 (3d Cir.1996) (quoting Hebden v. Workmen’s Comp. Appeal Bd., 534 Pa. 327, 330, 632 A.2d 1302 (1993)). There is thus no merit to Brooks’s claim that the District Court erred in considering facts not found by the PHRC.[6]
*779 IV.
We have considered all of Brooks’s arguments on appeal, and none succeed to persuade. Because a jury could not reasonably conclude that Brooks was subjected to a hostile work environment or constructively discharged, we -will affirm the judgment of the District Court.

. Specifically, Brooks was offended by, inter alia, the following passages:
(i) "If you are black selling to white Middle America, dress like a white .... This clothing conveys that you are a member of the establishment and that you are pushing no radical or other feared ideas.”
(ii) "Blacks selling to whites should not wear Afro hairstyles or any clothing that is African in association. If you are selling to corporate America, it's very important that you dress, not as well as the white salesman, but better than them. You have to wear suits, shirts and ties that are expensive *773 and more conservative than your white coworkers.”
(iii) "If you are white selling to blacks, you will fare much better if you dress in non-establishment patterns. Black America is essentially divided into two camps, establishment and anti-establishment, and the divisions are not dictated by income alone .... Almost all members of Northern ghettos who are in the lower socioeconomic groups are understandably antiestablishment .... The black establishment includes all blacks who have made it along with almost all Southern, rural blacks, no matter what their position. Southern blacks do not consider themselves disenfranchised
(iv) “When selling to middle class blacks, you cannot dress like a ghetto black ...."
(v) “It is an undeniable fact that the typical upper-middle-class American looks white, Anglo-Saxon and Protestant. He is of medium build, fair complexion with almost no pronounced physical characteristics. He is the model of success; that is, if you run a test, most people of all socioeconomic, racial and ethnic backgrounds will identify with him as such.”
(vi)"The two groups who have the most problems with their appearances are black men and Hispanic men. It is unfortunate but true that our society has conditioned us to look upon members of both groups as belonging to the lower classes, and no matter how high a minority individual rises in status or achievement, he is going to have some difficulty being identified by his success rather than his background. But clothing can help.”
(Administrative Record ("A.R.”) at 69-74.)

. Infinity's policy stated that the corporation “will not tolerate any form of harassment on account of race’’ and that "[h]arrassing conduct includes, but is not limited to[,j epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group (including through e-mail).” (Supp. A.R. at 17, 19.) The policy further instructed employees to “report their complaints to their immediate supervisor, their Department Head, their Station Manager, their Station's designated Ombudsperson, or the Human Resources Department before the conduct becomes severe or pervasive” and advised that "[I]ndividuals should not feel obligated to file their complaints with their immediate supervisor first before bringing the matter to the attention of one of the other Infinity designated representatives identified above.” (Id. at 17.)

. The District Court reached this conclusion by first finding that, under federal law, Brooks had administratively exhausted his five additional allegations of harassment and that these incidents could be considered as part of Brooks's hostile work environment and constructive discharge claims in federal court. Because the Pennsylvania Commonwealth Court had determined that, under state law, Brooks had failed to exhaust the additional allegations, the District Court concluded that the issue decided in the prior state adjudication was not identical to the one before it and accordingly denied the motion to dismiss on the ground of issue preclusion. CBS Radio did not cross-appeal this ruling.

. There is some force to Brooks's argument that the District Court misapplied the "totality of the circumstances” test when determining Brooks could not show that he suffered intentional discrimination because of his race. The District Court began this section of its analysis by noting that although "[f]aeially neutral conduct in addition to overt racial discrimination can support a hostile work environment claim[,] ... there must be at least some overt racially hostile words or conduct to signal the invidious nature of the facially neutral conduct.” (A.R. at 23.) The District Court then concluded that "because there were no overtly or explicitly racially hostile comments or conduct directed at either Mr. Brooks or others,” the undisputed evidence in the record failed to raise a genuine issue of fact as to whether the alleged conduct was intentionally based on race. (A.R. at 24.) As Brooks correctly notes, this line of reasoning conflicts with language found in Aman, where this Circuit indicated that acts of harassment need not be "accompanied by racially discriminatory statements.” Aman, 85 F.3d at 1083; see id. ("[O]vert racial harassment is not necessary to establish a hostile environment.”).
In any event, although the District Court erred by requiring Brooks to show some form of overt racial harassment in order to establish that he was intentionally discriminated against based on race, the District Court nonetheless correctly determined that a reasonable jury could not find that the alleged harassment was motivated by a racially discriminatory animus. Indeed, under Aman, Brooks was required to present "a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white [he] would not have been treated in the same manner.” Id. This he simply failed to do.

. Given that the second prong, the "severe or pervasive” element, includes both an objective and subjective inquiry, this requirement substantially overlaps with the third and fourth elements of this Circuit’s hostile work environment claim, which respectively re *777 quire a plaintiff to establish (i) that the discrimination detrimentally affected him and (ii) that the discrimination would have detrimentally affected a reasonable person of the same protected class in his position. Cf. Jensen, 435 F.3d at 451 ("When applied, [the second and fourth prongs] coalesce into a single inquiry: did the plaintiff suffer ... harassment severe or pervasive enough to alter the conditions of her employment and create an abusive working environment?” (internal quotation marks and citations omitted)).

. Brooks also contends that the District Court should have treated the PHRC findings as jury findings and limited itself to determining whether those findings were supported by suf *779 ficient evidence. Because Brooks's argument that the PHRC should have been treated as the fact-finder in the federal action rests on his fatally flawed assertion that the PHRC findings should have been given preclusive effect, this argument also fails to persuade. Moreover, it lacks any foundation in logic or authority.