**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2862

_____

JENNIFER STEIN,
                         Appellant

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-21-cv-00272)
District Judge:  Honorable Malachy E. Mannion

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
May 17, 2023

_____

Before:  CHAGARES, *Chief Judge*, GREENAWAY, JR., and PHIPPS, *Circuit Judges*.

(Filed: June 14, 2023)
_____

OPINION[*]
_____

PHIPPS, *Circuit Judge*.

After a romantic relationship between two correctional officers ended, one of

them, Jory Eisenmann, began to harass the other, Jennifer Stein.  But they still worked

together, and one morning they had an intense argument at the prison.  In response to a

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

complaint by Stein, the prison altered Eisenmann's work conditions but left Stein's schedule and post unchanged. Those measures kept them apart for about two years, but then the two crossed paths at work a handful of times over a three-month period. Afterwards, Stein sued under Title VII of the Civil Rights Act of 1964 for sex discrimination, alleging a hostile work environment and retaliation. The District Court rejected those claims at summary judgment, and on appeal, Stein now disputes the judgment as to her hostile-work-environment claim. On *de novo* review, we will affirm the District Court's judgment.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

Jennifer Stein is a correctional officer with the Federal Bureau of Prisons (the 'BOP'), an agency within the United States Department of Justice. For almost ten years, she has worked in that role at the United States Penitentiary Canaan in Waymart, Pennsylvania. Starting in 2014, she began to date intermittently another correctional officer at the prison, Jory Eisenmann. They ended their relationship for good in early 2017.

Eisenmann did not handle the break-up well. On the morning of August 8, 2017, after weeks of badgering Stein with phone calls, he followed Stein in from the prison parking lot, cornered her in the officers' mailroom, and began screaming at her to return his furniture. As part of his invective, Eisenmann called Stein a "whore" and puffed up his chest to shove her and prevent her from leaving. App. 113 ¶ 31. Even after Stein escaped the mailroom, Eisenmann followed her down the corridor and continued to insult her until she entered a lieutenant's office. At the lieutenant's urging, Stein reported the mailroom incident. With her supervisors' permission, she also left work to seek an emergency petition for protection from abuse ('PFA'). She received a PFA order from a

2

local court that day.  Before that incident, Stein had not reported any sexual harassment by Eisenmann to anyone in her chain of command, and that was the first time her superiors learned of tensions between the two of them.

In response to the report of Eisenmann's harassment, the prison warden formed a threat-assessment committee to investigate.  The committee interviewed both Stein and Eisenmann and, on August 30, the warden approved a personal protection plan for Stein.

In seeking to separate them at work, that plan brought sweeping changes for Eisenmann's workday but left unchanged Stein's post and work schedule.  The BOP transferred Eisenmann to the minimum-security satellite camp located a mile from the penitentiary, changed his hours, and prohibited him from entering the penitentiary without informing his supervisor in advance and obtaining an escort.  The BOP also issued a cease-and-desist order to Eisenmann, under which he had to avoid unprofessional contact with Stein.  By contrast, Stein remained at her post at USP Canaan to work the same days and hours.  Beyond the day-to-day, the plan mandated that the two officers attend separate trainings.  And as a final protective measure, the plan directed Stein to report workplace contact of any kind from Eisenmann.

For the two years following the start of the plan, Stein and Eisenmann had no contact at work.  In June 2018, about ten months after the plan was implemented, Stein took a leave of absence to recover from a work-related injury.  Soon after she left, the BOP returned Eisenmann to the penitentiary to mitigate staffing shortages, and it notified Stein of that development.  Several months later, in February 2019, after Stein returned to work in the penitentiary's administration building, Eisenmann would sometimes exit the facility through the staff screening room where she was stationed, but the two never made contact there.

In September 2019, Stein had the first of a handful of workplace interactions with Eisenmann. One day, as Stein arrived at the sally port of one of the penitentiary's housing units, she found Eisenmann standing in the doorway glaring at her with his arms folded and chest puffed out. He also quipped to another female colleague that "here comes your girl coming for property." App. 926. The next month, Eisenmann took two voluntary shifts in Stein's post and again stared at her. And then in November 2019, Eisenmann sent Stein an email at work about an inmate who did not receive his property back, asking her to "please check and see if he has any property at all in the property room." *Id.* at 1188.

Following these events, Stein initiated the process for pursuing a claim for sex discrimination. Upon exhausting the administrative process, Stein filed this federal action in February 2021. Invoking the jurisdiction of the United States District Court for the Middle District of Pennsylvania, *see* 42 U.S.C. § 2000e-5(f)(3), she brought hostile-work-environment and retaliation claims against the Attorney General in his official capacity as agency head.[1] She alleged that the BOP fostered a hostile work environment by failing to control Eisenmann's harassment, and that it retaliated against her for reporting Eisenmann and for making an earlier unrelated complaint by passing over her for awards and promotions, scheduling Eisenmann to work in her post, denying her requests for administrative leave, and marking her as 'AWOL' when she was absent from work.

---

[1] Stein commenced this action against the Acting Attorney General, for whom the Attorney General was later substituted. *See* Fed. R. Civ. P. 25(d) (providing for the automatic substitution at the district-court level of public officers sued in their official capacities); *cf. also* Fed. R. App. P. 43(c)(2) (providing for the automatic substitution at the appellate level of public officers sued in their official capacities).

4

After a period of discovery, the Attorney General moved for summary judgment on several grounds. With respect to Stein's hostile-work-environment claim, the Attorney General argued that she failed to show that Eisenmann mistreated her on account of her gender, that she did not experience severe or pervasive harassment, and that the Attorney General cannot be held liable for Eisenmann's harassment. And as to Stein's retaliation claim, the Attorney General maintained that she could not establish a *prima facie* case or, in the alternative, show that the BOP's articulated, non-discriminatory reasons for the challenged employment decisions were pretextual. The District Court granted that motion and entered judgment against Stein on both of her claims.

Stein timely appealed that final order, bringing the matter within this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291. On appeal, Stein meaningfully contests only the rejection of her hostile-work-environment claim.[2] The Attorney General defends the entry of summary judgment on the grounds that Stein was not subject to a hostile work environment and that, in any event, there is no basis for employer liability regarding Eisenmann's misconduct.

## DISCUSSION

A hostile-work-environment claim under Title VII requires not only proof of "severe or pervasive" harassment but also "a basis for employer liability." *Komis v.*

---

[2] Stein's appellate brief does not develop any separate argument that the District Court erred in rejecting her retaliation claim, and without more, that issue has not been properly presented. *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017) (explaining that this Court has "consistently refused to consider ill-developed arguments or those not properly raised and discussed in the appellate briefing"); *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (refusing to consider "arguments raised in passing . . . but not squarely argued").

*Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 293 (3d Cir. 2019) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  Like other employers, the liability of federal agencies for a hostile work environment often "depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009); *see also Komis*, 918 F.3d at 294 (explaining that "many courts have consistently interpreted [42 U.S.C.] § 2000e-16(a) 'to give federal employees the same rights as private employees'" (quoting *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. 1981))); *Taylor v. Solis*, 571 F.3d 1313, 1318–20 (D.C. Cir. 2009) (applying private standards of employer liability to a hostile-work-environment claim against a federal agency).  And here, Stein does not contend that Eisenmann, as a fellow correctional officer, had supervisory responsibility over her.  *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 216 (3d Cir. 2017) (explaining that an employee is a supervisor for purposes of a hostile-work-environment claim "if he or she is 'empowered by the employer to take tangible employment actions'" against the victim (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013))).  Nor does she develop any other argument for supervisor liability.[3]

Instead, Stein's case rests on a theory of co-worker liability.  An employer can be held liable for harassment by one of the victim's non-supervisory coworkers only in two scenarios: (i) "the employer failed to provide a reasonable avenue for complaint," or

---

[3] Stein's brief does state that her "supervisors and co-workers created a hostile work environment."  Opening Brief 20.  And it points out that one of her lieutenants walked by the mailroom during her altercation with Eisenmann and so may have been aware of the nature of their argument just prior to Stein's report of it that morning.  But without any legal argument associated with that fact, Stein has forfeited any claim premised on supervisor liability.  *See John Wyeth*, 119 F.3d at 1076 n.6.

(ii) "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *In re Trib. Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (quoting *Huston*, 568 F.3d at 104); *see also Vance*, 570 U.S. at 424 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."). Here, Stein does not argue that the BOP provided an inadequate process for making complaints about sexual harassment at USP Canaan. Rather, she seeks to establish employer liability for coworker harassment through the second approach.

To succeed on such a theory, Stein must demonstrate that the BOP "was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment." *Huston*, 568 F.3d at 105. But unless the misconduct should have been discovered earlier, liability under this approach does not attach when an employer, upon learning of harassment by the victim's coworker, takes prompt action that "is reasonably calculated to prevent further harassment." *Id.* at 110 (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 411 n.8 (3d Cir. 1997)). Thus, as a matter of law, a response by the employer that is effective, *i.e.*, one that in fact prevents further harassment, is adequate and insulates the employer from liability for a hostile-work-environment claim. *See Jensen*, 435 F.3d at 453; *Huston*, 568 F.3d at 110 ("[T]he employer cannot be liable under Title VII if its remedial action stopped the harassment.").

In this case, the BOP took prompt remedial action in response to Stein's report of the mailroom incident.[4] The day of the incident, Stein's lieutenants had her draft a

---

[4] Stein also briefly asserts that the BOP should have discovered that Eisenmann was harassing her before the August 2017 mailroom incident. But her testimony that her coworkers at USP Canaan knew of her relationship with Eisenmann and his poor treatment of her does not overcome her admission that before the mailroom incident she never reported any episodes of sexual harassment to those in her chain-of-command, or

7

detailed memorandum regarding Eisenmann's harassment, and they immediately reported the incident up the chain-of-command to the prison's warden. Upon receiving that report, the warden convened a threat-assessment committee the same day. That committee then interviewed both parties and developed a personal protection plan to keep Stein safe at work. Under that plan, the BOP reassigned Eisenmann, changed his hours, issued him a cease-and-desist order, and implemented additional controls to prevent him and Stein from being alone together at work.

In addition to its promptness, the BOP's response was effective. Stein and Eisenmann did not have any interactions at work for over two years. And the interactions they had after that time were sporadic and did not rise to the level of harassment: those episodes consisted of a caustic quip, unfriendly body language, and an email that, at least on its face, was work-related. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that Title VII does not reach "the sporadic use of abusive language, gender-related jokes, and occasional teasing" (quoting Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 175 (1992))); *Burlington*, 548 U.S. at 68 (emphasizing that "Title VII . . . does not set forth 'a general civility code for the American workplace'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 716 (3d Cir. 1997) (observing that "mute gestures" made by the plaintiff's coworkers could not "be

---

her concession that her supervisors first learned of such harassment on the day of that incident. Nor does Stein produce enough concrete facts to allow a reasonable jury to conclude that management-level employees of the BOP otherwise knew or should have known of any pre-August 2017 sexual harassment by Eisenmann. *See Huston*, 568 F.3d at 105; *see also Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (stressing that a hostile-work-environment plaintiff "must point to concrete evidence in the record that supports each and every essential element" of their claim (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))).

characterized as particularly severe" despite those coworkers having also harassed her seven months earlier).

Because the BOP's prompt response to Stein's report of the mailroom incident prevented further sexual harassment, it was adequate as a matter of law. *See Knabe*, 114 F.3d at 411 n.8. As the lack of employer liability resolves the controversy, it is unnecessary to address the Attorney General's other argument for affirmance, the contention that Stein's work environment was not hostile.

## CONCLUSION

For these reasons, we will affirm the District Court's summary judgment in favor of the Attorney General.