**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1286
_____

MOHAMMED HUSSEIN,
Appellant

v.

UPMC MERCY HOSPITAL
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-09-cv-00547)
District Judge: Honorable Terrence F. McVerry
_____

Submitted Under Third Circuit LAR 34.1
February 10, 2012

Before:   SLOVITER and VANASKIE, *Circuit Judges*, and POLLAK, *District Judge*[*]

(Filed: February 24, 2012 )
_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge.*

_____

[*]The Honorable Louis H. Pollak, Senior District Judge for the United States
District Court for the Eastern District of Pennsylvania, sitting by designation.

Mohammed Hussein appeals the District Court's grant of summary judgment in favor of UPMC Mercy Hospital (the "Hospital") on his retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. Const. Stat. § 951 *et seq.* We agree with the District Court that the Hospital is entitled to summary judgment and will affirm.

I.

We write primarily for the parties, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those facts necessary to our analysis.

The Hospital hired Hussein as a nuclear medicine technologist in 1976. His job responsibilities included performing diagnostic tests and completing medical documentation for Hospital patients. His direct supervisor was Amy Dietz, the lead nuclear medicine technologist, who reported to Becky Volk, the Radiology Department director.

Hussein was a practicing Muslim, and learned in June 2006 of an opportunity to attend a group pilgrimage to Mecca from December 2006 to January 2007. The Hospital had a seniority system for allocating vacation time and required employees to submit vacation requests for December by the preceding February. Because Hussein did not learn of the opportunity to travel to Mecca until well after February, he submitted a late vacation request in June 2006. Volk denied the request, stating that another technologist had already requested vacation time on the same dates. In October 2006, Hussein told Sister Patricia Hespelein, a vice president at the Hospital, that Volk had violated his

2

"religious rights" by denying his vacation request, and asked for assistance in obtaining permission to attend a pilgrimage in December of 2007. (A. 231.)

Hussein then submitted a new vacation request in January 2007, requesting leave to participate in the December 2007 pilgrimage. Although Hussein's second vacation request was timely, he submitted it outside of the Hospital's seniority-based system for allocating vacation time. Volk denied the request on the grounds that Hussein had failed to follow the Hospital's policy for submitting vacation requests.

Hussein testified that Hespelein, acting on Hussein's October 2006 complaint, informed him that she spoke with Volk in February 2007 and obtained permission for him to attend the December 2007 pilgrimage.[1] In April 2007, Hussein claims that Volk "showed her displeasure" for his report to Hespelein by calling him into her office concerning an unrelated matter and asking him to explain why he spoke with Hespelein about the vacation requests. (A. 234.) Hussein also claims that Volk "just was plain[,] short, [and] cold [in] demeanor to [him]," and "became more hostile" to him after his report to Hespelein. (A. 234-35.) According to an affidavit by Amy Helfrich, a former employee at the Hospital, "Becky Volk told [her] that [she] should 'document' anything [she] saw that Mr. Hussein did wrong" and "made it clear . . . that she wanted Mr. Hussein out of the department." (A. 249.)

One year later, in April 2008, Hussein engaged in two acts of purported misconduct that the Hospital investigated, culminating in his termination on April 24,

---

[1] Hussein did participate in a pilgrimage at the end of December 2007.

3

2008.[2] Amy Dietz, Hussein's direct supervisor, testified that she began investigating Hussein's alleged misconduct after a doctor informed her on April 14, 2008 that Hussein failed to notify a Hospital physician, Dr. Schultheis, about missing images in a renal scan on April 12, 2008. Dietz testified that Hussein's alleged failure to notify the physician of the missing images was an infraction because the patient "could have had some serious medical issues with her care had they gone off of what [Hussein] had done." (A. 269.)

According to Hussein, he realized while he was conducting the renal scan that the machine was malfunctioning and that several images were missing, so he immediately informed Dr. Schultheis about both the malfunction and the missing images. Dr. Schultheis submitted an affidavit, attesting that Hussein notified him that he had "technical problems" during the scan. (A. 264.) According to Dietz's notes, however, Dr. Schultheis agreed that Hussein notified him of "camera issues," but did not notify him of the missing images. (A. 192.)

On the same day that Dietz learned about Hussein's alleged failure to report the missing images, Sharon Boros, another technologist in Hussein's department, reported to Dietz that Hussein had placed her initials on a record for a blank scan on April 3, 2008. According to Dietz, placing another employee's name on a scan record violated Hospital policy because it attributed responsibility for the scan to that employee. She further testified that she interpreted Boros's complaint as indicating that Hussein was placing multiple initials on scan records to avoid full responsibility for potential mistakes.

_____

[2] The Hospital initially claimed in Hussein's termination letter that he engaged in three acts of misconduct, but the Hospital now claims on appeal that Hussein committed only two acts of misconduct.

4

Hussein claims that he did not know how to perform the blank scan, so Boros helped him to prepare for it. Around the time that the camera began scanning, Boros left, and Hussein completed the scan. Afterwards, Hussein placed both his initials and Boros's initials in the Hospital record, because it was common practice in the Radiology Department to give credit to an employee who assisted in conducting a scan by placing that employee's initials in the record.

Dietz testified that she began her investigation of Hussein's alleged misconduct by speaking with Dr. Schultheis and Hussein about the April 12, 2008 incident. She then reported her findings about both the April 3, 2008 and April 12, 2008 incidents to Volk, who responded that she "had a history" with Hussein, and instructed Dietz to "talk to [Human Resources], and [to] please do all of it with [department manager] Lisa [Haskins]." (A. 266.) Dietz understood Volk's response as meaning that Volk "didn't want to be involved" in the investigation, and therefore proceeded by speaking with Haskins and with Human Resources. (A. 266.)

Haskins knew that Hussein had complained to Hespelein about Volk at some point, but likewise testified that Dietz indicated that Volk "had a prior issue" with Hussein, "and [that] [Volk] want[ed] to stay out of it, so [that the investigation] could be objective." (A. 253.) Haskins further testified that she instructed Dietz to conduct a full investigation, and then she and Dietz consulted with Human Resources. Neither Haskins nor Dietz testified that Volk directed the investigation or recommended Hussein's dismissal.

5

Hussein testified in his deposition that he believed Volk was on a leave of absence during the investigation and that Haskins was "[t]aking [Volk's] place." (A. 117.) He also testified that he believed that Volk was involved in the investigation because he assumed, without knowing, that Haskins spoke with Volk before terminating him, and because Haskins copied Volk on the termination letter.

After Hussein's termination, he sued the Hospital under Title VII; the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*; and the PHRA. His Title VII and PHRA claims alleged both discrimination and retaliation. The parties filed cross-motions for summary judgment, and the District Court granted summary judgment to the Hospital on each of Hussein's claims.

In granting summary judgment on Hussein's retaliation claims, the District Court reasoned that Hussein "failed to adduce any evidence from which a reasonable factfinder could find that [the Hospital's] real reason for terminating Plaintiff's employment was discriminatory animus." *Hussein v. UPMC Mercy Hosp.*, No. 2:09-cv-00547, 2011 U.S. Dist. LEXIS 396, at *32 (W.D. Pa. Jan. 4, 2011) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 146-47 (2000)). The District Court noted that "Volk, the person with alleged retaliatory motives, did not participate in either the internal investigation into his instances of misconduct or in the decision to terminate his employment," and that Hussein "is unaware whether Sister Hespelein ever communicated his complaints to Volk." *Id.* at *33-34. Hussein now appeals the District Court's decision only as to his retaliation claims.

II.

6

The District Court had jurisdiction over Hussein's Title VII claim under 28 U.S.C. § 1331 and had supplemental jurisdiction over Hussein's PHRA claim under 28 U.S.C. § 1367. We have appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over district court decisions granting summary judgment. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). Summary judgment is appropriate when the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.

Hussein asserts that the District Court erred in holding that he fails to show evidence of retaliation. His theory is that Volk harbored retaliatory animus against him because he reported her vacation request denials to Hespelein. Although he acknowledges that Dietz and Haskins, rather than Volk, conducted the investigation that led to his termination, he posits that the investigation was "at the direction of Becky Volk." (Appellant's Br. 13.) The Hospital counters that Hussein fails to establish a *prima facie* case of retaliation, because he does not present any evidence linking Volk's alleged retaliatory animus to Hussein's termination. Alternatively, the Hospital argues that Hussein's two acts of alleged misconduct were legitimate reasons for his termination, and that Hussein does not present sufficient evidence to discredit these reasons.

Title VII's anti-retaliation provision forbids an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

7

VII]." 42 U.S.C. § 2000e-3(a). The PHRA, which we generally interpret consistently with Title VII, likewise forbids employers from retaliating against employees for asserting their rights under the PHRA.[3] *See Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567 (3d Cir. 2002) ("The language of the PHRA is . . . substantially similar to [Title VII and other federal] anti-retaliation provisions, and we have held that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different . . . .") (citing *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996)).

To assert a *prima facie* Title VII retaliation claim, the employee must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). If the employee establishes his or her *prima facie* claim, "the familiar *McDonnell Douglas* approach applies[,] in which 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct." *Id.* at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). If the employer provides such a reason, the burden shifts back to the employee to show "that the

---

[3] The PHRA's anti-retaliation provision forbids employers from "discriminat[ing] in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Cons. Stat. § 955(d).

8

employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quoting *Krouse*, 126 F.3d at 501).

B.

We agree with the Hospital that Hussein fails to establish a *prima facie* retaliation claim because he does not show a causal connection between Volk's alleged retaliatory animus and the Hospital's termination decision. In deciding whether the plaintiff has shown causation, we "have tended to focus on two factors: (1) the 'temporal proximity' between the protected activity and the alleged discrimination and (2) the existence of 'a pattern of antagonism in the intervening period.'" *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006) (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)) (internal citation and quotation marks omitted), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Additionally, we may consider whether the record "as a whole" suggests retaliation. *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997).

Hussein appears to argue that the record as a whole suggests retaliation, noting that Volk specifically noted her displeasure in April, 2007 with his earlier report to Hespelein, that she treated him less favorably after his report, and that she indicated to Helfrich "that she wanted Mr. Hussein out of the department."[4] (A. 249.) Hussein

---

[4] Hussein does not argue that the temporal proximity between his complaint to Hespelein and his termination raises an inference of retaliation, presumably because well over a year passed between his complaint and his termination. *See, e.g.*, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("[A] gap of three months between the protected activity and the adverse action, without more, cannot

provides little explanation, however, for how Volk's alleged retaliatory animus infected the Hospital's termination decision, speculating only that the investigation operated under Volk's direction.

The record does not support Hussein's theory. To the contrary, Hussein admitted in his deposition that he has no actual knowledge that Volk was involved in his termination, instead testifying that he believed that Volk was on a leave of absence during the investigation and termination decision.[5] While Dietz and Haskins did not suggest that Volk was on a leave of absence, they both indicated that they believed that Volk was not participating in the investigation to avoid imparting bias. Although Dietz spoke with Volk before initiating a full investigation, Hussein presents no evidence that Volk was behind the investigation or that she encouraged his termination.

Hussein's argument is similar to the plaintiff's argument in *Weston v. Pennsylvania*, in which Weston contended that his employer retaliated against him by suspending him after he complained of sexual harassment to his supervisor. *See* 251 F.3d 420, 424 (3d Cir. 2001), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53. Although Weston's supervisor may have harbored retaliatory animus and "did play a role in the suspensions," a panel of three impartial hearing officers "ultimately decided" to issue the suspensions. *Id.* at 433. We concluded that

---

create an inference of causation and defeat summary judgment.") (internal citations omitted).

[5] The only direct evidence of Volk's involvement to which Hussein points is Haskins's decision to copy Volk on his termination letter. We do not agree, however, that this shows that Volk was involved in the termination decision.

Weston failed to show causation, in part because the hearing officers who made the suspension decisions had no retaliatory animus. *Id.*; *see also Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 415 (3d Cir. 1999) (holding that the plaintiff failed to show retaliation where there was no evidence that the employees who disciplined him knew of his protected activity).

As in *Weston*, Hussein asserts that a supervisory employee harbored retaliatory animus against him, but fails to show that the decisionmakers responsible for his termination held any retaliatory animus. Instead, he speculates that Dietz and Haskins may have acted under Volk's direction, but he offers no factual support for his assertion. Accordingly, as in *Weston*, Hussein has failed to present sufficient facts to raise an inference of a causal relationship between his protected activity and his termination. Because causation is a necessary element of Hussein's *prima facie* case, the Hospital is entitled to summary judgment. [6]

III.

For the foregoing reasons, we will affirm the District Court's judgment.

---

[6] Because we hold that Hussein has failed to establish a *prima facie* case of retaliation, we do not address the parties' remaining dispute over whether the Hospital's proffered reasons for Hussein's termination were pretextual.